RYAN T. OKABE, CSB#215964
Attorney at Law
Okabe & Haushalter
1230 Rosecrans Avenue
Suite 300
Manhattan Beach, Ca. 90266
(310) 543-7708
Email: ryan@southbaylawyer.com

BRIAN A. NEWMAN, CSB#89975
Law Offices of Brian A. Newman
Post Office Box 987
Hermosa Beach, Ca. 90254
(424) 275-4014
Email: jjnewbee.newman@gmail.com

Attorney for Defendant,
Martin Marsich

# UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>  vs.<br><br>MARTIN MARSICH<br><br>       Defendant, | Case No.: 3:18-CR-00370-WHA-1<br><br>**DEFENDANTS SENTENCING MEMORANDUM AND REQUEST FOR VARIANCE**<br><br>Date:  July 16, 2019<br>Time: 2:00 p.m.<br>Place: Courtroom 12, 19th Floor<br><br>**Honorable William Alsup** |

# I.
## OPENING COMMENTS

Defendant Martin Marsich by and through his attorneys of record, Ryan T. Okabe and Brian A. Newman, hereby submits his Sentencing Memorandum, setting forth the factors the Court should consider in determining what type of sentence is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. §3553(a).

Few legal principles are as deeply entrenched in our present jurisprudence as the concept of individualized sentencing. As the Supreme Court, has observed:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime. *Pepper v. United States, 131 S. Ct. 1229, 1239, 1240 (2011).*

Thus, in each case a sentence should reflect an individualized assessment of a particular offender's culpability and potential success in the community rather than a mechanical application of given sentence to a particular category of crime. This memorandum will not only provide a legal basis for Mr. Marsich's requested sentence, but investigate and examine his background, character, and value system in an effort to understand his conduct in this case. Mr. Marsich's

behavior in this case is incongruent with the responsibility he has shown in other areas of his life.

## II.
## SUMMARY OF DEFENDANT'S SENTENCING MEMORANDUM

Martin Marsich is prepared to accept the sentence the Court finds appropriate pursuant to the plea agreement filed in this case. Mr. Marsich understands that accepting responsibility for his conduct may include the potential of incarceration in federal custody. However, Mr. Marsich, through his lawyers, moves the court to vary from the calculated adjusted guideline level of 10, which consists of 6 to 12 months (PSIR at ¶26) and impose a mitigated non-custodial sentence with an appropriate term of supervised release, showing for good cause as follows:

### A. Procedural Posture

1. Mr. Marsich is charged by Indictment with a single count – Count 1: Obtaining Information from a Protected Computer Without Authorization, a violation of *18 U.S.C. § 1030(a)(2)(C) and (c)(2)(B)(i).* In late-March of 2018, Electronic Arts (EA) headquartered in Redwood City, had discovered that someone had gained unauthorized access into EA internal systems. The alleged intrusion was reported to the Federal Bureau of Investigation. EA had discovered that the unauthorized user granted access to 17,000 EA player accounts. The

unauthorized user also provided "in-game currency" to another 8,000 EA users. According to the complaint, the unauthorized user gained access to EA internal systems with the utilization of a "***server secret key, which was not publicly accessible***". EA provided the suspected hacker's IP address to the FBI, who determined it was associated with Mr. Marsich. Mr. Marsich, who was in the United States on a tourist visa[1] was arrested at the airport, in route home to Serbia. He was taken into federal custody on August 8, 2018.

2. Pursuant to a plea agreement, Mr. Marsich entered a plea of guilty to Count 1: Obtaining Information from a Protected Computer Without Authorization a violation of *18 U.S.C. § 1030(a)(2)(C) and (c)(2)(B)(i).* Mr. Marsich and the Government agree, pursuant to U.S.S.G. § 2B1.1, that the Base Offense Level (BOL) is 6 (PSIR at ¶ 18). Additionally, Mr. Marsich recognizes and accepts that the Specific Offense Characteristics of loss amount per U.S.S.G. § 2B1.1(b)(1)(D) (adding 6 levels) (PSIR at ¶ 19). In exchange for Mr. Marsich's guilty plea the Government agrees to recommend up to a two-level reduction for acceptance of responsibility and recommend a probationary sentence. Mr. Marsich agrees with the Government that that the adjusted offense level is 10 and criminal history category of I (PSIR at ¶ 30). The statutory

---

[1] As a result of the underlying arrest, Mr. Marsich has overstayed his Visa and is presently out of status with the Department of Homeland Security, as there is no remedy to extend his status.

maximum range of imprisonment for count 1 is 5 years (PSIR at ¶ 50). A three-year, maximum period of supervised release is available (PSIR at ¶ 52).

3. Mr. Marsich agrees that the Government's Guideline Range recommendation that the Total Offense Level is 12. The Probation Office determines a Criminal History Category I. The resulting "advisory" guideline range of imprisonment is 6 to 12 months.[2]

4. Mr. Marsich moves the court to vary from the recommended range and sentence him to a probationary sentence.

## B. Summary of the Argument

5. The Guidelines are advisory. *United States v. Booker,* 125 S. Ct. 738, (2005)*, Gall v. United States*, 128 S.Ct. 586, 591 (2007). The properly calculated guideline range is not to be presumed reasonable by the district court. *Gall v. United States, supra 587,588.* The advisory guideline range is 6 to 12 months, resulting from an offense level of 10 and Criminal History Category I. The guideline range offers no useful advice as it fails to take any account of Mr. Marsich's culpability, his lack of criminal history, his miniscule risk of

---

[2] Sentencing ranges in Zone B include confinement terms ranging from one to 15 months. The guidelines advise that Zone B allows probation terms to be substituted for imprisonment, provided that the probation term includes confinement conditions (community confinement, Alternative Sentencing in the Federal Criminal Justice System, intermittent confinement, or home detention). The guidelines avoid sentencing ranges greater than six months for Zone B offenders by requiring probation terms for these to include intermediate confinement.

recidivism or collateral punishment as a result of the underlying matter. Also, any potential incarceration serves no useful societal or correctional purpose at this point in Mr. Marsich's life and is greater than necessary to promote the goals of sentencing in this case.

6. Mr. Marsich obviously accepts responsibility for his conduct. He also accepts the application of, and recognizes that the Specific Offense Characteristic of Loss Amount and is applicable. Mr. Marsich does not object to the properly calculated and adjusted offense level of 10 which results in an advisory "low end" guideline range of 6 months. However, while the Loss Amount enhancement is applicable under statute, it overstates the seriousness of Mr. Marsich's conduct in the offense, which consists of him exposing a major design flaw in EA programming. A flaw, that EA would have had to correct at some point in order to maintain the integrity of its software. It is important to note, that Mr. Marsich's access to EA servers, resulted in EA improving its security infrastructure. Also, Mr. Marsich did not access to EA's server, through some brute force cyber-attack or malware intrusion. Mr. Marsich simply provided an in-game token code which was publicly available, meaning that anyone could have accessed the EA servers.[3] The Government's initial allegation that Mr. Marsich accessed a "secret key" is inaccurate. Also, Mr. Marsich's intention to

---

[3] See Exhibit C.

access EA was not to personally gain from the flaw, as he could have compromised the personal data of thousands of users. Instead, Mr. Marsich only hoped to improve his FIFA soccer team on EA. While Mr. Marsich undoubtedly benefitted from the scheme, by improving his video-based soccer team, his efforts were not for the purposes causing EA harm. Application of the loss amount enhancement skyrockets the offense level by 6 levels doubling the base offense level of 6, adding a significant period of custodial time (for a first-time offender) which pushes his potential incarceration beyond the scope of reasonable and just punishment.

7. Mr. Marsisch has made a good faith effort, to make his criminal conduct "right" by agreeing to pay the determined restitution amount of $25,000 (PSIR at ¶ 51), at the time of sentencing. Mr. Marsich, also made good faith, post-charge, efforts to meet with EA (by way of defense counsel), in order to assist EA in correcting their design flaws. Mr. Marsich's willingness to assist EA and provide full restitution illustrates his willingness to maintain a pro-social and law-abiding lifestyle.

8. Martin Marsich is a 26-year-old dual citizen of Italy and Serbia, who has pled guilty to a single count of *Obtaining Information from a Protected Computer Without Authorization.* Up until the present matter, Mr. Marsich was a successful entrepreneur and investor who worked hard to maintain financial

independence. Notwithstanding the present matter Mr. Marsich lacks a criminal history. Inspired by a significant addiction to gaming, and with hopes of improving his video-based soccer team, Mr. Marsich took advantage of EA's glaring design flaw in an effort to cheat the system and create a super team. Undoubtedly, his decision-making process was clouded by poor judgement, and not criminal orientation. Nevertheless, his offense is completely uncharacteristic when viewed in the context of his entire life. Martin Marsich, *a first-time offender*, now faces a potential guideline sentence that could incarcerate him for months, a daunting prospect for someone who has never been engaged with the criminal justice system. As demonstrated below, on multiple levels, Martin Marsich deserves a probationary sentence which will be sufficient to promote the goals of sentencing. Also, such a sentence is not greater than necessary given the circumstances of the case and personal characteristics of the defendant.

9. The collateral consequences of the underlying offense have been many. Mr. Marsich has been on house-arrest for nearly a year, without the opportunity to work, given his residency status. Mr. Marsich, has fallen out of legal status with the Department of Homeland Security, and will likely be unable to ever return to the United States. Being unable to return to Serbia for the past year, Mr. Marsich has not seen his family or girlfriend in nearly a year. When Mr. Marsich returns home he may be financially destitute as a result of the

underlying matter.

10. Analysis of the facts of this case and application of §3553 factors, which includes a horrifying childhood, favor a mitigated probationary sentence and a one-year term of supervised release.

11. Since being initially contacted by agents, Mr. Marsich has been cooperative with the judicial system as evidenced by his immediate admissions, his full compliance with stringent pretrial release conditions, and a very timely guilty plea. Mr. Marsich accepts full responsibility for his conduct. Mr. Marsich's compliance with the law, during these trying times, is the best evidence of his character.

12. Based on his unconditional acceptance of responsibility, his willingness to assist the complaining witness, immediate payment of restitution in full, his history of resiliency, and nearly a full year of compliance on pretrial house arrest, a probationary sentence would be sufficient to reflect the seriousness of the offense, to deter future crimes, to promote respect for the law, to protect the public and to provide just punishment for the offense as called for by Title 18 U.S.C. § 3553(a)(2).

**III.**
**THE PROBATION OFFICE HAS OVERSTATED THE FACTS OF THE CASE**

The probation office issued its final version of the Presentence

Investigation Report (PSIR) on July 8, 2019. Previously, the defense had submitted a letter to the probation office outlining a series of objections. Of primary concern to Mr. Marsich is the characterization and description of him as a "hacker", and his conduct as a "hack". Mr. Marsich continues to object to all of these characterizations as they do not properly describe his conduct. While Mr. Marsich, wholeheartedly accepts responsibility for his conduct, he did not interfere or intrude on EA servers and networks in the manner that a traditional "hacker" would. Mr. Marsich, did not employ a "brute-force attack"[4] nor did he attack EA servers with the use of malware.[5] Mr. Marsich, simply inputted a code that was openly available to any user. The code was not "hidden" nor "secret" in any manner. In other words, Mr. Marsich simply took advantage of a glaring design flaw in the EA program, to access EA servers.

## IV.
## THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT
### *18 U.S.C. § 3553(a)(1)*

The following was compiled following extensive interviews with Mr. Marsich, and a review of his familial history. An understanding of Martin's

---

[4] A **brute force attack** is a trial and error method used by application programs to decode encrypted data such as passwords or Data Encryption Standard (DES) keys, through exhaustive effort (using **brute force**) rather than employing intellectual strategies.

[5] Malware is any software intentionally designed to cause damage to a computer, server, client, or computer network. Malware does the damage after it is implanted or introduced in some way into a target's computer and can take the form of executable code, scripts, active content, and other software.

family and his chronological history give insight into his social image and development.

Martin Marsich was born on March 2, 1993, in Trieste, Italy. Martin was born out of wedlock to his mother, Milka and to his father Elvino. Martin is essentially estranged from his father, whom he has only met on one occasion. On that one occasion, during his teenage years, Martin recalls his arrogant father showing him pictures of other children, he had fathered. Martin has no kind memory of his father.

Growing up, Martin lived with his mother Milka, who is 52 today. During his childhood, the two were often transient and at times lived in their vehicle. They had very little food, and very little money. When housing was available, the circumstances were often squalor and dangerous. Living amongst narcotic traffickers and pimps was not unusual. Martin's mother lived a questionable lifestyle that may have included working as a dancer at strip clubs and appearing in pornographic films. Martin recalls being physically abused by his mother which included being struck by leather belts and wooden spoons. Martin has no recollection of seeing a doctor or dentist as a child. Unfortunately, these terrible incidents and overall fight for survival are deeply embedded in Martin's memory.

Despite these challenges, Martin proved to be quite exceptional throughout his early academic years. Often times, he brought home excellent marks and

often received praise from his teachers. Martin had a natural curiosity and instinct for knowledge. As his mother, failed to provide any real parental supervision, Martin was often left to his own devices at home. Martin and has mother were never settled in a residence long enough for Martin to establish any meaningful friendships. Martin was a loner. In order to pass time and fill the void of loneliness that Martin often felt, he turned to video games.

As his interest in video games grew into an unhealthy obsession, his academics greatly suffered. Martin's grades in high school plummeted as his attendance was sporadic to say the least. Ultimately, Martin lost all interest in high school and did not graduate. He spent most of his days, playing video games. It is also during this period, that Martin became self-taught in coding. Martin was a quick learner. It was evident that Martin's professional future would be centered around computers and technology.

Following his failed attempt at secondary school, Martin entered a 3 year vocational based program in Graphic Multimedia Arts. Martin excelled in the program, in which he graduated and received certification. It was during this time, that his coding skills grew.

During his late teens, Martin struggled with personal relationships which resulted in depression, anxiety and a suicide attempt. Martin also struggled with alcohol abuse.

Martin continued to live with his mother, who had moved into a family home in Serbia, north of the Italian border. Even though Martin had successfully completed a rigorous vocational education program, the workplace was extremely competitive and un-welcoming to Martin. Martin grew angry and resentful of his mother. Martin wanted financial independence. It was during this time that Martin's interest in bitcoin and crypto-currency grew. He learned all aspects of this exciting and new investment opportunity. Martin invested small amounts of monies, which returned large astronomical profits. Martin's ability to analyze and predict crypto-currency trends made Martin financially independent, at the time. Martin was able to travel the world and pursue his hobbies which also included gambling and playing FIFA soccer video games. Martin readily admits, that his obsession with FIFA was similar to a gambling addiction that he has struggled with in the past.[6]

Today, Martin spends his days in an apartment, alone in Los Angeles watching television and awaiting the outcome of the underlying matter. He has become introspective of his present legal situation, yet he hopes to return to his homeland at the earliest possible moment in order to return to his loving relationship with his girlfriend, Jelena, who is awaiting his return from the United States. Martin, has no intentions of returning to the United States.

---

[6] Since his release on bond, Martin has been treated and counseled by Dr. Jeff Whiting for addiction related behaviors.

## Overview of Gaming Addiction

Video game addiction is also known as gaming disorder or internet gaming disorder and is generally defined as problematic, compulsive use of video and/or internet games, that results in significant impairment in an individual's function.[7] This and associated concepts have been under considerable research, debate, and discussion amongst experts in several disciplines and have generated controversy from the medical, scientific and gaming communities. The disorder may present itself as compulsive  gaming, social isolation, mood swings, diminished imagination,  and *hyperfocus* on in-game achievements to the exclusion of other events in life.[8] Such disorders can be diagnosed when an individual engages in gaming activities at the cost of fulfilling daily responsibilities or pursuing other interests and without regard of the negative consequences.

While the American Psychiatric Association does not recognize video game addiction as a disorder, in light of existing evidence, the organization included video game addiction as a "condition requiring further study" in the *Diagnostic and Statistical Manual of Mental Disorders* as Internet gaming disorder.

---

[7] *Schivinski, Bruno; Brzozowska-Woś, Magdalena; Buchanan, Erin M.; Griffiths, Mark D.; Pontes, Halley M. (December 2018).* "Psychometric assessment of the Internet Gaming Disorder diagnostic criteria: An Item Response Theory study". *Addictive Behaviors Reports. 8: 176–184.*

[8] Ibid.

**FACTS OF THE CASE AND PROCEDURAL BACKGROUND**

The following is a summary of the underlying facts of this case as set forth in the criminal complaint, plea agreement, and the presentence report.

In late-March of 2018, Electronic Arts (EA) headquartered in Redwood City, had discovered that someone had gained unauthorized access into EA internal systems. The alleged intrusion was reported to the Federal Bureau of Investigation. EA had discovered that the unauthorized user granted access to 17,000 EA player accounts. The unauthorized user also provided "in-game currency" to another 8,000 EA users.[9] According to the complaint, the unauthorized user gained access to EA internal systems with the utilization of a "***server secret key, which was not publicly accessible***".  EA provided the suspected hacker's IP address to the FBI, who determined it was associated with Marsich.  Mr. Marsich, who was in the United States on a tourist visa[10] was arrested at the airport, in route home to Italy.  He was taken into federal custody on August 8, 2018.

Since his initial appearance, Mr. Marsich has complied with all pretrial

---

[9] EA initially reported a loss of $324,000 based on unauthorized "in-game currency" or coins. However, EA's initial report of loss was inaccurate as "in-game currency" has no real-world value.

[10] As a result of the underlying arrest, Mr. Marsich has overstayed his Visa and is presently out of status with the Department of Homeland Security, as there is no remedy to extend his status.

release conditions, including home detention, electronic monitoring and has made all court appearances as scheduled, and has accepted responsibility by entering into a plea agreement with the Government in a timely fashion.

Sentencing in this matter is set for July 16, 2019, before this Honorable Court.

## VI.
## THE STATUTORY SENTENCING FACTORS IN 18 U.S.C. U.S.C.§3553(a) REQUIRE A SENTENCE BELOW THE GUIDELINES RANGE

Core principles in sentencing have now been resolved by the Supreme Court in *United States v. Booker,* 125 S. Ct. 738, (2005)*, Gall v. United States*, 128 S.Ct. 586, 591 (2007) and *Kimbrough v. United States*, 128 S. Ct. at 570 (2007).

> The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable.
> -*Nelson v. United States, 129 S.Ct. 890,891 (2009).*

What the Supreme Court has described as the "overarching provision" of 18 U.S.C. § 3553(a) is set forth in that provision's very first sentence – that "the court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in subparagraph (2) of this subsection." *Kimbrough v. United States*, *128 S. Ct. at 570 (2007).* This description by the Supreme Court makes clear that this "parsimony principle" is not mere precatory language, but is a key – in fact, *the* key – requirement that a sentence must

satisfy. Thus, factors justifying a sentence outside the guideline range *are no longer required to be "extraordinary." Gall, 168 S.Ct. at 595.*

> Congress could not have been clearer in directing that no limitation ... be placed on the information concerning the background, character, and conduct of a defendant that a district court may receive and consider for the purpose of imposing an appropriate sentence…Permitting sentencing courts to consider the widest possible breadth of information about a defendant "ensures that the punishment will suit not merely the offense but the individual defendant."
> *-Pepper, 131 S.Ct at 1240.*

Thus, the challenge in this case is to determine a fair sentence that is sufficient, but not greater than necessary. A sentence that is too severe is unjust, and therefore, also fails to promote respect for and confidence in the law. As it pertains to Mr. Marsich, the sentence which is sufficient, but not greater than necessary, is far less than the guideline range of 12 months the probation office has calculated. Rather, when examining Mr. Marsich's life, and the conduct involved, which does not involve computer "hacking" in the traditional sense—a probationary sentence to include restitution is more than appropriate. This is further corroborated by the fact that Mr. Marsich will be rectifying restitution at the time of sentencing. Application of the §3553(a) factors support this.

**<u>Just Punishment</u>** *(18 U.S.C. § 3553(a)(2)(A))*

Mr. Marsich's tragic personal history is a considering factor and similar to that in other cases where the District Courts have considered departures or

variances to be warranted. See *United States v. Lopez*, 938 F.2d 1293, 1297-99 (D.C.Cir. 1991)(Where Defendant received 51 months in cocaine case, case remanded for district court to consider departure because Defendant was exposed to domestic violence; the death of his mother by his stepfather murdering her, his need to leave town because of threats, and his growing up in slums); *United States v. Walter*, 256 F.3d 891 (9th Cir. 2001)(where Defendant sent threat to the president, court could downward depart because of combination of brutal beatings by defendant's father, the introduction of drugs and alcohol by his mother, and sexual abuse); *United States v. Rivera*, 192 F.3d 81, 84 (2nd Cir. 1999)("It seems beyond question that abuse suffered during childhood - at some level of severity - can impair a person's mental and emotional conditions……district courts may properly grant a downward departure on the ground that extreme childhood abuse caused mental and emotional conditions that contributed to the defendant's commission of the offense.").

As noted by Mr. Marsich's treating psychologist, Dr. Jeffrey Whiting…

Martin reports that beginning when he was 7 years old, he experienced life as if it was a movie on a video screen. "It was like I was watching and observing things around me but nothing seemed real. When I became a teenager it became apparent to me that this was unusual and that other people did not have this same phenomenon." It appears that his subjective experience was minimized, or at least his sense of his sensations and even thoughts were not his, but a video of what might be going on. He states that he has few childhood memories and that his adolescence is very vague. It was noteworthy during our interviews, that generating a history of his life was quite laborious and time-consuming. It also appeared to be emotionally depleting.

My analysis of this childhood phenomenon was that what he was describing was a psychiatric

condition called "derealization", a thought disorder sometimes seen in victims of severe abuse, neglect, and/or trauma. Having memories are too painful because of the nature of what those memories would cause the patient to re-experience. The result is a condition characterized by the production of a distancing from actual feelings and thoughts because they cause too much distress (See Exhibit A).

In addition to Mr. Marsich's childhood, and likely in significant part because of it, Mr. Marsich has suffered from loneliness, isolation, self-loathing and has been prone to addiction-based behaviors that have clouded his best judgement. In spite of such personal challenges, he has shown fortitude and resiliency and has been able to find independence and success on his own terms. The imposition of any custody time in this matter is unnecessary and serves no useful purpose. The goals of just punishment can be adequately served with the imposition of a probationary sentence.

## Avoiding Unwarranted Disparities among Defendants with Similar Records who Have Been Found Guilty of Similar Conduct *(18 U.S.C. §3553(a)(6))*

This factor weighs heavily in Mr. Marsich's favor for being sentenced below the guidelines. Mr. Marsich points to a similar case that originated in the Northern District of Texas; United States vs. Anthony Clark, et al, 16:CR-00205. In this matter Mr. Clark and his three co-defendants conspired to defraud EA by mining FIFA coins from EA servers and selling the FIFA coins on the black market. Clark and his co-defendants netted 15 to 18 million dollars in the scheme. Charges versus Mr. Clark were dismissed due to him committing suicide. The three remaining co-defendants were sentenced to probation.

Mr. Marsich's conduct in the underlying matter is far less egregious, far less sophisticated, and far less serious. Sentencing Mr. Marsich to anything beyond probation would cause an unwarranted disparity in sentencing.

**VII.**
**CONCLUSION**

Martin Marsich is before the Court for sentencing. He has entered a guilty plea to a serious cyber-crime related charge. Mr. Marsich has spent nearly a year on house arrest, and has abided by all conditions in an exemplary manner. Mr. Marsich has clearly made a serious mistake that today threatens his freedom; however, his recent error should not overshadow his resiliency and survival skills that has ultimately made him successful. Martin Marsich stands before the Court and requests compassion and understanding.

Martin Marsich has many personal challenges at the moment, but nevertheless is ready to accept responsibility for his actions and move forward with his life. To that end, it is clear that leniency and compassion will be the vehicle that will return Mr. Marsich-*a first time offender*- to the continued path of pro-social behavior.

Incarceration is not necessary and serves no correctional or societal purpose in this matter. Mr. Marsich requests that the Court impose a probationary sentence. Such a sentence is more than sufficient to constitute just and fair punishment.

Respectfully Submitted on this 10th day of July, 2019.




   ***/s/ Ryan T. Okabe***
Ryan T. Okabe,
Attorney for the Defendant
State Bar Number: 215964




***/s/ Brian A. Newman***
Brian A. Newman,
Attorney for the Defendant
State Bar Number: 89975

**VIII.**
**LIST OF EXHIBITS**

A. PSYCHOLOGICAL ASSESSMENT OF MARTIN MARSICH

B. POLYGRAPH EXAM ADMINISTRED TO MARTIN MARSICH

C. REPORTS/ASSESSMENT OF COMPUTER FORENSIC EXAMINER
   LARRY BERLINER

D. PHOTOS RELATED TO MARTIN MARSICH

PROOF OF SERVICE

I declare that I am over the age of 18 and not a party to the within action. My business address is 3838 Carson Street, Suite 304/300 Torrance, California 90503 [Mailing Address: Post Office Box 987 Hermosa Beach, California 90254].

On 7/10/2019 I served the following documents: DEFENDANT MARSICH'S SENTENCING MEMORANDUM AND REQUEST FOR VARIANCE AND EXHBITS on the interested parties in this action by placing a true copy of each document thereof, enclosed in a sealed envelope addressed as follows:

Susan Knight
Assistant United States Attorney
VIA EMAIL: susan.knight@usdoj.gov


Monica Romero
Probation Officer
VIA EMAIL:  monica_romero@canp.uscourts.gov

(     )       By Mail.  I caused such envelope with postage thereon fully prepaid to be placed in the United States mail at 225 Avenue I, suite 201, Redondo Beach, CA 90277.
(XX  )       By CM/ECF Service.  I caused said document to be delivered by CM/ECF transmission to the above addressee(s).
(XX  )       By email transmission.  I caused said document to be delivered by email transmission to the above addressee(s).
(     )       By FAX Service.  I caused said document to be delivered by facsimile transmission to the above addressee(s).
(     )       By Personal Service.  I caused the envelope to be delivered by hand to addressees at the addresses indicated.
(XXX )  (Federal)  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.


                          Sahnde Moulton   
                       SAHNDE MOULTON